UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ARTHUR CROSS                                   CIVIL ACTION

versus                                         No.  06-3507

RELIANCE STANDARD LIFE                         SECTION: "I"/5
INSURANCE COMPANY, ET AL.

ORDER AND REASONS

Before the Court are cross motions for summary judgment filed by plaintiff, Arthur "Skip" Cross, and defendants, Reliance Standard Life Insurance Company ("Reliance") and Diversified Foods, Inc. ("Diversified").   For the following reasons, the Court concludes that defendants' motion for summary judgment should be **GRANTED** and that plaintiff's motion should be **DENIED.**

*FACTUAL AND PROCEDURAL BACKGROUND*

Plaintiff was hired by Diversified as Director of National Account Sales on January 1, 2001.  Effective April 1, 2001, plaintiff was insured through Diversified under a long-term disability plan issued by Reliance.  This plan and plaintiff's claims are governed by the Employee Retirement Income Security Act of 1974 ("ERISA").[1]  On June 25, 2004, plaintiff terminated his employment with Diversified and submitted a claim for disability benefits in connection with a heart condition.[2]

---

[1] Rec. Doc. No. 29, p. 1.

[2] Rec. Doc. No. 25-2, pp. 1-2.

On September 24, 2004, Reliance issued a letter denying plaintiff's application for long term disability benefits.[3]   An administrative appeal followed, and on June 16, 2005, Reliance informed plaintiff through his attorney that it had completed its review of the denial of benefits.   Reliance stated that, after conducting an independent review of the claim facts and determination, denial of long term disability benefits was appropriate because the claim file information did not support a finding of "total disability."[4]   On July 6, 2006, plaintiff filed the present lawsuit.[5]

**Plaintiff's Medical Condition**

Plaintiff's heart condition dates back to at least 1984, when he had an aortic valve abnormality which required surgery.   In the years prior to plaintiff's claimed disability, he occasionally experienced cardiac symptoms and underwent additional catheterization and stenting procedures.[6]   On April 3, 2002, Carlos Sotolongo, M.D., plaintiff's then treating physician, noted on an insurance form that plaintiff was never expected to return to full or part-time work.[7]   On February 24, 2003, he underwent a left

---

[3]Admin Rec. 70.

[4]Admin Rec. 2.

[5]Rec. Doc. No. 1.

[6]Rec. Doc. No. 29, p. 2.

[7]Admin Rec. 462.

internal mammary artery implant.[8]  On February 4, 2004, plaintiff underwent a Cardiolite stress test, which showed normal blood pressure response and a borderline abnormal baseline ECG.  The test was clinically positive for ischemia,[9] but electrocardiographically negative for ischemia.[10]

On March 4, 2004, plaintiff underwent another Cardiolite stress test, which noted that he achieved 90% of his maximum predicted heart rate and achieved 9.4 METS of activity.  As plaintiff points out, the report also concluded that he was clinically borderline positive for myocardial ischemia versus deconditioning and electrocardiographically borderline positive.[11]

On June 7, 2004, plaintiff had his last doctor visit prior to his June 25, 2004 stated disability date.[12]  Plaintiff complained of dyspnea on walking from the front door to the car and fatigue.  Dr. Kusnick noted plaintiff complained of insomnia and severe work

---

[8]Admin Rec. 252.

[9]Ischemia is defined as a "condition in which a part of the body suffers from a lack of blood, usually because of a contraction of the blood vessels, as in myocardial ischemia (caused by a narrowing of the coronary arteries)."  3 ATTORNEYS' DICTIONARY OF MEDICINE 4377 (2005).

[10]Admin Rec. 282.

[11]Admin Rec. 284.

[12]Rec. Doc. No. 29, p. 2.

related stress, including a very adversarial supervisor.  His blood pressure was 140/90 and his weight was 262 pounds.[13]

Meanwhile, beginning on April 21, 2004, and continuing consistently through June 7, 2004, plaintiff sent resumes to numerous employers and contacts, seeking a sales or sales manager position.[14]  He sent one final resume on June 22, 2004, three days before his stated disability date and one day before the disability letter issued by his doctor.[15]

In a letter dated June 23, 2004, Barry Kusnick, M.D., plaintiff's treating physician and a board certified cardiologist, informed Reliance that plaintiff was "classified as permanently disabled effective immediately."  Dr. Kusnick noted plaintiff's medical history of 14 heart catheterizations, 2 angioplasty interventions, 3 coronary artery stent placements, an aortic value replacement in 1982, and the February 2003 artery bypass procedure.  He also noted defendant's current treatment with multiple cardiovascular medications and weekly follow-up in the Coumadin clinic.  Dr. Kusnick stated that it was his medical opinion that

---

[13]Admin Rec. 458.

[14]Admin Rec. 109-122.

[15]Admin Rec. 124.

plaintiff discontinue full or part-time work immediately, given his medical history, continued physical decline, and increase in objective symptoms.[16]

On June 25, 2004, plaintiff's employer filled out the Reliance claim form, stating that plaintiff's occupation requires frequent standing, walking, and sitting, and occasional lifting/carrying of up to 45 pounds.[17]

On July 26, 2004, at his first visit subsequent to his stated disability date, plaintiff told Dr. Kusnick that he had walked 1.5 miles in 35 minutes.[18] Plaintiff subsequently moved to Charlotte, North Carolina, and he was examined by Richard Jacoby, M.D., a board certified cardiologist, on December 7, 2004.[19] On a follow-up visit to Dr. Jacoby on December 23, 2004, plaintiff complained of some chest discomfort while playing golf. Dr. Jacoby noted that, besides some increased chest discomfort, plaintiff "has done well."[20] In a letter following a March 3, 2005, office visit, Dr. Jacoby wrote that plaintiff's functional limitations, including dyspnea on exertion, "would make meaningful employment difficult."[21]

---

[16]Admin Rec. 457.

[17]Admin Rec. 225.

[18]Rec. Doc. No. 29, p. 2.

[19]Admin Rec. 43.

[20]Admin Rec. 40.

[21]Admin Rec. 36.

At the request of Reliance, in a review dated August 25, 2004, nurse Dorothy McGarry reviewed plaintiff's medical records. McGarry noted that plaintiff exercised to 9.4 METS, but he had an abnormal adenosine portion positive for chest pain and moderate ischemic changes.  She concluded that he was "capable of sedentary restrictions and limitations" and that these restrictions and limitations would have to be permanent.[22]

At the request of Reliance, in a letter dated September 11, 2004, cardiologist Marvin Goldstein, M.D., reviewed the medical records and interpreted the March, 2004 stress test to indicate that Mr. Cross should be able to perform a light duty occupation.[23] Dr. Goldstein saw no evidence of any change in Cross's cardiac condition on or around June 2004,[24] when his disability allegedly occurred.

On March 16, 2005, following the initial denial of benefits by

---

[22]Admin Rec. 261.

[23]Dr. Goldstein relied on the light duty classification provided by two different medical sources:  (1) an article in the Journal of American College of Cardiology, and (2) *Clinical Cardiac Rehabilitation*, edited by Pashkow and Dafoe. Admin Rec. 256.  The first source describes light occupational work as "carrying light weight objects, i.e., 20 lb" and sedentary work as "sitting, slow walking, lifting light objects, i.e., 10 lb."  Admin Rec. 257.  The second source describes light work as including "walking (3-4 mph)" and "stocking shelves (light objects)," and "light carpentry."  Admin Rec. 258.
        Although Dr. Goldstein did not specifically rely on the DOT occupational categories with which Reliance determined plaintiff's occupational requirements, the Court finds that the sources upon which Dr. Goldstein relied impose standards for "light" work that are at least as stringent as those imposed by the DOT occupational titles applicable to plaintiff.  *See infra* note 49.  Therefore, Reliance could properly rely on Dr. Goldstein's determination that plaintiff could perform the material duties of his "light exertion occupation."  *See* Admin Rec. 6.

[24]Rec. Doc. No. 29, p. 2; Admin Rec. 256.

Reliance and at plaintiff's request, William Porter, M.D., who practices in internal medicine, hematology, and oncology,[25] reviewed plaintiff's medical records.  Dr. Porter noted that the January 5, 2005 stress test showed a normal ejection fraction and no wall motion abnormalities.   Still, Dr. Porter noted plaintiff's "significant extertional dyspnea" and concluded that Mr. Cross "is totally and permanently disabled for any occupation."  Dr. Porter went on to state, "It is my opinion that Mr. Cross's physicians have been correct when they advised him to quit work, based on the probability that continued employment, even in a relatively sedentary occupation, would pose considerable medical risk to Mr. Cross."[26]

Plaintiff also made a declaration on March 10, 2005, as additional support for his claim.  In that statement, plaintiff argued that his position with Diversified was not "sedentary" and involved significant activity, such as giving plant tours, traveling, and demonstrating products.[27]  Plaintiff also noted the considerable stress of his position and his supervisor's "relentless" expectations.[28]  Plaintiff stated that his physical condition had worsened to the point that it was "extremely

---

[25]Admin Rec. 11.

[26]Admin Rec. 9-10.

[27]Admin Rec. 23-24.

[28]Admin Rec. 24.

difficult" for him to do household activities like taking out the trash.[29]

On April 26, 2005, Jeffrey F. Caren, M.D., a board certified cardiologist, conducted a peer review of plaintiff's medical records on behalf of Reliance.  Dr. Caren classified plaintiff as having a Class II cardiac condition, which is defined by the Criteria Committee of the New York Heart Association as "Patients with cardiac disease resulting in slight limitation of physical activity.  They are comfortable at rest.  Ordinary physical activity results in fatigue, palpitation, dyspnea, or anginal pain."[30]  Dr. Caren found that the Cardiolite testing revealed "a low risk profile for future cardiac events."  Dr. Caren concluded that plaintiff was capable of working at a light occupation, as defined by the U.S. Department of Labor's Dictionary of Occupational Titles.[31]

## LAW AND ANALYSIS

### I. Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

---

[29]Admin Rec. 26.

[30]Rec. Doc. No. 29, p. 3.

[31] Admin Rec. 254.

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the moving party carries its burden of proving that there is no material factual dispute, the burden shifts to the nonmovant "to show that summary judgment should not lie." *Hopper v. Frank,* 16 F.3d 92, 96 (5th Cir. 1994). While the court must consider the evidence with all reasonable inferences in the light most favorable to the nonmovant, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); *Webb v. Cardiothoracic Surgery Associates of North Texas,* 1998 WL 175313, *2 (5th Cir. 1998). This requires the nonmoving party to do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, 475 U.S. at 586, 106 S. Ct. at 1356. The nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); *Auguster v. Vermillion Parish School Board,* 249 F.3d 400, 402 (5th Cir. 2001). In this case, there is no genuine issue as to any material fact, and the Court finds that defendants are entitled to a judgment as a matter of law.

## II. Standard of Review Pursuant to ERISA

ERISA provides the federal courts with jurisdiction to review determinations made by administrators of employee benefit plans. 29 U.S.C. § 1132(a)(1)(B); *Vega v. National Life Ins. Services, Inc.*, 188 F.3d 287, 295 (5th Cir. 1999) (en banc). The district court reviews two elements of the benefit determination-the factual findings of the administrator and the administrator's interpretation of the ERISA governed policy. *Green v. Prudential Ins. Co. of America*, No. 04-3101, 2005 WL 2036788, at *5 (E.D. La. Aug. 5, 2005) (Fallon, J.).[32]

An administrator's factual determinations underlying a decision to deny benefits are entitled to deference and are reviewed for an abuse of discretion. *Pierre v. Connecticut Gen. Life Ins. Co.*, 932 F.2d 1552, 1562 (5th Cir. 1991). When applying the abuse of discretion standard, courts in this Circuit analyze whether an administrator has acted arbitrarily or capriciously.

---

[32]The Fifth Circuit has explained the analytic methodology applicable to ERISA cases as follows:

> In sum, ERISA and its regulations contemplate a system in which the administrator makes a decision as to whether to grant or deny benefits based on the factual scenario and based on its interpretation of the relevant plan provisions . . . . If the administrator denies benefits, the claimant may bring suit under § 1132. The district court will then engage in a deferential review of the administrator's factual determinations, based on the record before the administrator. Next, depending on whether the plan expressly grants the administrator discretion in interpreting its terms, the reviewing court will review the administrator's interpretation of the plan provisions either under a de novo or an abuse of discretion standard.

*Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 395 (5th Cir. 1998).

-10-

*Lain v. UNUM Life Ins. Co.*, 279 F.3d 337, 342 (5th Cir. 2002).

A plan administrator's factual determinations are arbitrary if they have "[no] rational connection between the known facts and the decision or between the found facts and the evidence." *Id.* at 342 (quoting *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Michigan*, 97 F.3d 822, 828 (5th Cir. 1996)). A plan administrator does not abuse its discretion if its factual determinations are "based on evidence, even if disputable, that clearly supports the basis for its denial." *Vega*, 188 F.3d at 299. A court must find an abuse of discretion in the absence of "some concrete evidence in the administrative record that supports the denial of the claim." *Id.* at 302. The Court is "constrained to the evidence before the plan administrator." *Id.* at 299.

A plan administrator's construction of the meaning of plan terms and plan benefit entitlement provisions is reviewed *de novo* unless there is an express grant of discretionary authority in that respect, in which case the review of those decisions is for abuse of discretion. *Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 226 (5th Cir. 2004). In this case, plaintiff stipulates that the plan grants discretionary authority to Reliance over the interpretation of the policy.[33]

---

[33]Rec. Doc. No. 25-2, p. 10. The policy states that Reliance "shall serve as the claims review fiduciary with respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary authority to interpret the plan and the insurance policy and to determine eligibility for benefits." Admin Rec. 155.

The Fifth Circuit has set forth a two-step methodology for testing a plan administrator's interpretation of a plan for abuse of discretion. *Vercher*, 379 F.3d at 227. Under such an analysis, the court first determines the legally correct interpretation of the plan and whether the administrator's interpretation accords with the proper legal interpretation. In order to determine the legally correct interpretation of the plan, a court must consider: (1) the uniformity of the plan administrator's interpretation; (2) whether that interpretation is consistent with a fair reading of the plan; and (3) any unanticipated costs resulting from different interpretations of the plan. *Id.* at 228. If the administrator's construction is legally sound, then no abuse of discretion occurred and the inquiry ends.

If the court concludes that the administrator has not given the plan the legally correct interpretation, the court must then determine whether the administrator's interpretation constitutes an abuse of discretion. *Id.* at 227-28. To determine whether an abuse of discretion has occurred, the Fifth Circuit has identified four factors:  (1) the plan's internal consistency under the administrator's interpretation, (2) any relevant regulations, (3) the factual background underlying the decision, and (4) any indication of lack of good faith. *Lain*, 279 F.3d at 346.

Where, as here, the plan administrator is also the insurer, the administrator has an inherent conflict of interest. *Green*,

2005 WL 2036788, at *6 (citing *Lain*, 279 F.3d at 343).  When an administrator acts under a conflict of interest, the Court applies a "sliding scale" to the abuse of discretion standard.  *Id.* (citing Vega, 188 F.3d at 297).  "The existence of a conflict is a factor to be considered in determining whether the administrator abused its discretion in denying a claim.  The greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be."  *Vega*, 188 F.3d at 297.  However, this review "need only assure that the administrator's decision fall somewhere on a continuum of reasonableness-even if on the low end."  *Id.*

**III. Analysis**

**A. Interpretation of the Policy**

*Benefit Determination by Reliance*

In its June 16, 2005 letter affirming the denial of benefits, Reliance found that plaintiff was not entitled to long term disability benefits because the claim file did not support a finding of "total disability," as defined in the policy.[34]  In pertinent part, the policy defines "total disability" as meaning, that as a result of injury or sickness, "during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her

---

[34]Admin Rec. 2.

-13-

regular occupation."[35]  The elimination period under the policy is 90 consecutive days of total disability, beginning on the first date of total disability.[36]

Under those terms, plaintiff had to be totally disabled on June 25, 2004, the date of plaintiff's claimed total disability, through September 23, 2004, for benefits to be payable.[37]  In its review letter, Reliance discussed the findings of plaintiff's treating physicians, as well as the report of plaintiff's consultant, Dr. Porter.[38]  Reliance also noted plaintiff's March 10, 2005 statement as evidencing an adversarial relationship between plaintiff and his boss, rather than an inability to perform the material duties of his occupation.  Reliance noted that emails from plaintiff seeking other sales and management positions, including one as late as June 22, 2004, further support the belief that it was this adversarial relationship, rather than plaintiff's health condition, which made his continued employment at Diversified untenable.[39]

In its letter, Reliance also defined its basis for determining the "material duties" of an individual's "regular occupation" in

---

[35]Admin Rec. 151.

[36]Admin Rec. 148.

[37]Admin Rec. 3.

[38]Admin Rec. 4.

[39]Admin Rec. 5.

order to assess benefits eligibility.  Reliance stated that it uses the Dictionary of Occupational Titles (DOT) published by the Department of Labor to determine the material requirements of an occupation.  Reliance stated that the position requirements of "Director of National Sales" were reviewed by a vocational specialist who determined that plaintiff's position was represented by the DOT titles "light Sales Representative" and "sedentary Manager Sales."[40]  Therefore, plaintiff's regular occupation would be performed at the "light exertion capacity."  Reliance specifically noted that the policy is based on ability to perform an employee's regulation *occupation*, as opposed to a specific *job*: "The difference between an *occupation* and a *job* being that an *occupation* is a vocation or profession as it typically exists in the general labor market whereas a *job* is a set of specific tasks performed for a specific employer."[41]

In conclusion, Reliance relied on the findings of Dr. Goldstein and Dr. Caren when it determined that plaintiff was capable of performing full time employment at the light exertion level.  Since Reliance found that the material requirements of plaintiff's occupation can be performed at the light exertion level, Reliance determined plaintiff did not meet the "total

---

[40]Admin Rec. 4-5.

[41]Admin Rec. 5.

disability" requirement to receive benefits under the policy.[42]

### *Definition of "Regular Occupation"*

Plaintiff challenges Reliance's interpretation of the plan term "regular occupation," asserting that the policy does not define the term and that Reliance's interpretation is not entitled to deference.  In addition to its potential conflict of interest as fiduciary, plaintiff argues that Reliance has inconsistently used the term "occupation."  Plaintiff notes that Reliance's claim form for employers asks specific questions about the physical aspects of the "employee's occupation."[43]  Plaintiff argues that if "occupation" merely refers to a job as performed in the general labor market, then Reliance should not need to ask an employer specifics about the "occupation."  Plaintiff asserts that this indicates an internal inconsistency in the interpretation of the term occupation, which the Court should reject and instead find plaintiff's work to be "'medium' work, directing a finding of disability."[44]

Defendant counters that if it simply asked the employer to provide the job title, it might not be able to find the comparable occupation in the DOT; therefore, there is no inconsistency between

---

[42]Admin Rec. 6.

[43]Admin Rec. 225.

[44]Rec. Doc. No. 25-2, p. 23.

its claim form and the policy interpretation.[45]  Defendant also notes that other courts have upheld interpretations of the term "occupation" which conclude that the term does not refer to a claimant's specific job duties.[46]

In *Osborne v. Hartford Life and Accident Insurance Company*, the Sixth Circuit found that an insurance policy granting the insurer discretionary authority to interpret policy terms permitted the insurer to use the DOT definitions to determine the employee's "own occupation" under the policy.  465 F.3d 296, 299 (6th Cir. 2006).  The Court found this definition appropriate under the insurer's discretionary authority, despite that it acted as both insurer and plan administrator.  *Id.* at 300.  The Court stated:

> The word "occupation" is sufficiently general and flexible to justify determining a particular employee's "occupation" in light of the position descriptions in the [DOT] Dictionary rather than examining in detail the specific duties the employee performed. "Occupation" is a more general term that seemingly refers to categories of work than narrower employment terms like "position," "job," or "work," which are more related to a particular employee's individual duties.

*Id.* at 299.  The Court additionally noted that "many courts have upheld a plan administrator's interpretation of 'regular occupation' as meaning a general occupation rather than a particular position with a particular employer."  *Id.* at 300 (quoting *Schmidlkofer v. Directory Distrib., Assoc., Inc.*, 107 Fed.

---

[45]Rec. Doc. No. 26, p. 14.

[46]Rec. Doc. No. 26, p. 14.

Appx. 631, 633 (6th Cir. 2004) (unpublished)).

Likewise, applying *de novo* review in a case where the policy did not grant Reliance discretionary authority, the Fourth Circuit held that Reliance properly relied on the DOT to define the employee's "regular occupation." *See Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 272 (4th Cir. 2002).[47]

Given the holdings in *Osborne* and *Gallagher* and the facts of this case, and applying the Fifth Circuit's three-part test in *Lain*, the Court concludes that Reliance applied a legally correct interpretation of the term "regular occupation." "In the instant case, there has been no allegation or evidence as to whether [Reliance] gave the Policy a uniform construction." *Lain*, 279 F.3d at 344. The only potential unanticipated cost resulting from a different interpretation of the policy would be that Reliance may have to pay benefits to plaintiff and possibly other employees or former employees. *Id.* Therefore, "[t]he crucial issue in this case is whether [Reliance's] interpretation of the Policy is fair and reasonable." *Id.*

As the Sixth Circuit in *Osborne* noted, "occupation" is a broader term than "job" or "work," and therefore sensibly refers to the general requirements of a position, rather than the intricacies

---

[47]In its *de novo* review, the Fourth Circuit noted, "A general job description of the DOT, to be applicable, must involve comparable duties but not necessarily every duty." *Gallagher*, 305 F.3d at 272. The Court found that the DOT job description was appropriate even though it omitted the travel requirement of plaintiff's specific job. *Id.* at 273.

of the work required for any one employer at a given moment in time.  Therefore, Reliance's definition of "occupation" as "a vocation or profession as it typically exists in the general labor market"[48] is fair and reasonable.  As applied to plaintiff through the DOT titles of "light Sales Representative" and "sedentary Manager Sales," the Court also finds Reliance's interpretation to be fair.[49]  Reliance has employed a legally correct interpretation of the term "regular occupation."  Accordingly, there can be no abuse of discretion regarding this interpretation of the plan.[50]

---

[48]Admin Rec. 5.

[49]For instance, the DOT sales representative occupational category states:

Lifting, Carrying, Pushing, Pulling, 20 Lbs. occasionally, frequently up to 10 lbs, or negligible amount constantly.  Can include walking and or standing frequently even though weight is negligible.  Can include pushing and or pulling of arm and or leg controls.

Admin Rec. 210.  The DOT sales manager category states:  "Lifting, Carrying, Pushing, Pulling, 10 Lbs. occasionally.  Mostly sitting, may involve standing or walking for brief periods of time."  Admin Rec. 205.
     The employer's report regarding plaintiff's duties largely reflects these duties, even noting that pushing and pulling were never required.  Admin Rec. 225.  While the employer's report indicates plaintiff occasionally had to lift or carry up to 45 lbs, *see id.*, the Court finds that this discrepancy does not make Reliance's definition unreasonable or unfair.  As in *Gallagher*, the DOT description involves "comparable duties," even if not every duty.  *Gallagher*, 305 F.3d at 272.  Moreover, as in *Gallagher*, plaintiff must demonstrate that he was unable to perform even some of the material duties of his occupation during the elimination period in order to be eligible for benefits.  *Id.*; Admin Rec. 151 (under plan terms, plaintiff is "partially disabled," not "totally disabled" as required during the elimination period, if he can perform some material duties on a full-time basis).  Therefore, if he fails to demonstrate that he is unable to perform some other material duties of his occupation, an inability to occasionally lift or carry 45 lbs "would not save his claim."  *Gallagher*, 305 F.3d at 272.

[50]The Court notes that it finds no internal inconsistency in Reliance's use of the term "regular occupation."  While plaintiff is correct that Reliance uses the term "employee's occupation" on its job-specific claim form for employers, the Court accepts Reliance's explanation that it might not be able to find the comparable occupation in the DOT without this additional information regarding an employee's duties.  In essence, this information aids Reliance in determining

-19-

**B. Support for the Administrator's Decision**

Plaintiff also challenges the support for Reliance's decision, arguing that it improperly disregarded the opinions of plaintiff's treating physicians in favor of its two consultants, and that its conflict of interest as fiduciary and insured should lead this Court to afford Reliance little or no deference. Plaintiff challenges the findings of defendant's first consulting doctor, Dr. Goldstein, arguing that his finding of light work capacity is unsound since plaintiff has ischemic heart disease and the data table on which Dr. Goldstein relied has not been verified for patients with the disease. Plaintiff also notes that Dr. Goldstein's approximation that plaintiff could walk three miles per hour is mathematically incorrect.[51]

Defendant counters that plaintiff's testing does not support a diagnosis of ischemia. Plaintiff's February 4, 2004, testing was clinically positive for ischemia, but electrocardiographically negative for ischemia.[52] Additionally, the March 4, 2004 testing indicated that plaintiff was only "clinically borderline positive

---

the fair and proper occupational title for a given employee; labeling the form in reference to the "employee's occupation" is, therefore, consistent with the ultimate goal of determining the proper occupational category.

[51]Rec. Doc. No. 25-2, p. 13. As plaintiff points out, based on plaintiff's statement that he walked 1.5 miles in 35 minutes, plaintiff's speed would be 2.57 mph, not 3 mph as suggested by Dr. Goldstein. *Id.*

[52]Admin Rec. 282.

for myocardial ischemia versus deconditioning," and "scintigraphically negative without evidence of stress induced myocardial ischemia."[53] While not disputing Dr. Goldstein's faulty math, defendant notes that his conclusions were also based on plaintiff's MET capacity. Based on the test results, the Court finds no evidence of bias or unreasonableness in Dr. Goldstein's finding of a light work occupational classification.

Plaintiff also attacks Dr. Caren's opinion as unsupported by the testing and facts of plaintiff's case. Despite plaintiff's efforts to emphasize certain aspects of plaintiff's test results,[54] the Court also finds no evidence of bias or unreasonableness in Dr. Caren's findings.[55]

Plaintiff also faults Reliance for its failure to credit the findings of its initial consultant, Nurse McGarry, noting that she found plaintiff would be permanently subject to sedentary restrictions and limitations.[56] However, as defendant notes, her evaluation was based on the information available in the claim file

---

[53]Admin Rec. 284.

[54]Rec. Doc. No. 25-2, pp. 18-20.

[55]Dr. Caren's April 26, 2005, review states that he reviewed 15 documents in forming his opinion, including records of plaintiff's treating physicians, test and hospital reports, Dr. Porter's assessment, and plaintiff's personal declaration. Admin Rec. 251-52. Moreover, while plaintiff disputes Dr. Caren's conclusions regarding plaintiff's test results, those conclusions are his as a board-certified cardiologist. The Court finds no credible evidence that Dr. Caren distorted or disregarded plaintiff's medical history and/or test results to reach some pre-determined medical diagnosis, and Reliance acted reasonably in considering his opinion in making its benefit eligibility determination.

[56]Admin Rec. 261.

-21-

merely two months after it was initially filed.[57]  Moreover, the opinion was also based on her training and experience as a nurse, not a cardiologist.  The Court finds no suspect motive in Reliance's decision to seek the evaluation of trained cardiologists and in deciding to value those opinions over the limited findings of Nurse McGarry.

Overall, plaintiff asserts that the findings of Reliance are entitled to little or no deference by this Court because they are driven's by Reliance's financial conflict of interest in making a negative benefits determination.  Although the record certainly supports some disagreement among doctors as to the full extent of plaintiff's limitations, the record does not support that Reliance has manipulated the facts or acted unreasonably to reach its decision as administrator of the plan.  Instead the Court finds that Reliance's decision was "based on evidence, even if disputable, that clearly supports the basis for its denial." *Vega*, 188 F.3d at 299.

While plaintiff strongly protests Reliance's decision to disfavor the findings of plaintiff's treating physicians, the Supreme Court has explicitly rejected a rule that would afford deference to the findings of treating physicians in ERISA cases. In *Black & Decker Disability Plan v. Nord*, the Supreme Court held

---

[57]Dr. Goldstein's letter is dated September 11, 2004, two weeks later. Admin Rec. 256.  Dr. Caren's review is dated April 26, 2005.  Admin Rec. 251.

that courts may not "require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." 538 U.S. 822, 834, 123 S. Ct. 1965, 1972, 155 L. Ed. 2d 1034 (2003). However, plan administrators may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *See also Vercher*, 379 F.3d at 233 (insurer appropriately considered treating physicians' diagnoses, but it was not required to give those opinions determinative weight).

As stated, Reliance reviewed the findings of plaintiff's treating physicians, Dr. Jacoby and Dr. Kusnick, during the relevant time period. Reliance also reviewed the evaluation of plaintiff's consulting physician, Dr. Porter.[58] Thus, it is clear that Reliance considered the diagnoses of those doctors, even though it permissibly cast doubt on their conclusions. Reliance instead chose to base its decision on the conclusions of Dr. Goldstein and Dr. Caren,[59] who found that plaintiff could perform light duty work. This crediting of their opinions over those of plaintiff's physicians is permissible under *Nord*. Although plaintiff also complains that the stress accompanying his job was

---

[58]Admin Rec. 4.

[59]Admin Rec. 4.

-23-

not considered,[60] this evidence was included in plaintiff's statement, which Dr. Caren considered in forming his opinion.[61] *See Gooden v. Provident Life & Acc. Ins. Co.*, 250 F.3d 329, 335 n.8 (5th Cir. 2001).

Moreover, Reliance cited other evidence in the record in support of its decision to deny benefits. Reliance found plaintiff's March 10, 2005 statement to be reflective of an adversarial relationship with his boss. Plaintiff's repeated emails seeking sales and management jobs in the period shortly before his claimed disability provide further evidence in support of Reliance's conclusion that plaintiff was not disabled and instead was seeking a lifestyle change. Reliance also noted the timing of the emails and plaintiff's infrequent visits to his cardiologist in the time period immediately surrounding his claimed disability date. As Reliance notes, prior to terminating his employment, plaintiff was performing the material duties of his job, and there is no documentation of a significant deterioration in his condition at or around his claimed disability date.[62]

Given this evidence, Reliance's determination that plaintiff was not incapable of performing the material duties of his regular occupation was not unfair or unreasonable. The finding was based

---

[60]Rec. Doc. No. 25-2, p. 23-24.

[61]Plaintiff's statement was prepared subsequent to Dr. Goldstein's evaluation and, therefore, could not be considered by him.

[62]Admin Rec. 5-6.

-24-

on evidence in the record that, although disputable, "clearly supports the basis for its denial." *Vega*, 188 F.3d at 299; *see also Green*, 2005 WL 2036788, at *8.  And the finding is rationally connected to the evidence in the record.  *Lain*, 279 F.3d at 342; *see also Matney v. Hartford Life and Accident Ins. Co.*, 172 Fed. Appx. 571, 573 (5th Cir. 2006) (unpublished).  Accordingly, although the Court considers the financial conflict of Reliance and plaintiff's other assertions of conflict,[63] this Court is bound to conclude that Reliance's decision as administrator has fallen "somewhere on a continuum of reasonableness" and was not an abuse of discretion.  *See Vega*, 188 F.3d at 297.

Accordingly, for the above and foregoing reasons,

**IT IS ORDERED** that defendants' motion[64] for summary judgment is **GRANTED** and plaintiff's motion[65] for summary judgment is **DENIED.**

New Orleans, Louisiana, April   20th , 2007.

LANCE M. AFRICK
**UNITED STATES DISTRICT JUDGE**

---

[63]As noted throughout this Order, plaintiff has asserted numerous purported examples of Reliance's conflict of interest.  The Court has considered those examples, including examples not explicitly addressed here, and finds no credible evidence of a conflict beyond the basic fact of Reliance's financial interest.

[64]Rec. Doc. No. 18.

[65]Rec. Doc. No. 25.